Mr. O'Leary, you have 10 minutes per side allotted. Mr. O'Leary, you have 7 minutes to begin. I actually had a preliminary question. I wasn't sure about subject matter jurisdiction. It's a diversity case, but the plaintiff is an LLC. And the complaint does not allege the citizenship of all of the members. It only alleges the state of organization and principal place of business. And I just wanted to be sure that we have complete diversity. Well, Your Honor, we filed, I believe this case was originally filed in state court. We removed it to federal court. And in our removal petition, I believe, and we're going back several years now, but I believe that we identified the Your removal petition says that the plaintiff was organized in New York and that its principal place of business is New York. But it is an LLC, correct? That is correct. And an LLC has the citizenship of all of its members, correct? That is correct. And do we know who the members are of Arizona Beverages? And do we know whether any of them are citizens in New Hampshire or Massachusetts? I mean, I'm just double checking. Well, in our removal petition, we did assert, obviously, the citizenship of the LLC. I don't believe there was any opposition or any attempt to remand the case as a consequence of the membership contest. There wasn't, but I was taught as a law clerk many years ago that we always double check subject matter jurisdiction. And I just wonder whether, who the members are of Arizona Beverages. And if any of the members are also LLCs or partnerships, and you have to look at the citizenship of each of the members. And maybe your colleague on the other side knows. I cannot speak to that right now. But the fact is the complaint does not sufficiently allege subject matter jurisdiction. Because it doesn't allege that no member of the LLC is a citizen of New Hampshire or Massachusetts. So if the lawyers don't know, that's something that should be checked. Because if we don't have subject matter jurisdiction, we don't have subject matter jurisdiction. Very well, Your Honor. Okay. You can proceed. Thank you, Your Honor. May it please the Court, Jeremiah O'Leary on behalf of the defendant appellate, Hanover Insurance Company. Your Honors, there are several issues for appeal in the instant matter. But I'd like for the sake of brevity to focus on one central issue that I think is dispositive, not only of this appeal and the error that was committed by the court below, but also dispositive of Hanover Insurance Company's motion for summary judgment warranting a reversal of the lower court and grant of summary judgment on behalf of Hanover Insurance Company. The issue presented by this appeal and that dispositive issue is really the scope and nature and timing of the extra expense coverage that is in the policy. The policy at issue in this case was a policy of equipment breakdown coverage. The claim was submitted as an equipment breakdown coverage claim. The claim related to a loss that occurred on October 29, 2017, where the insured's computer equipment was damaged in a power surge event resulting from lightning. The date of that loss is not in dispute. The fact that that computer equipment, which was the subject of the initial claim, was restored and replaced and fully functional by January 8, 2018, some three months later, less than three months later, is also not disputed. The real subject of this dispute is the extra expense or purported extra expense costs associated with enhanced auditing that was undertaken by the insured's accountants, Deloitte and Tooch, long after the equipment that was the subject of the claim, the computer equipment, was restored and fully functional. The court below essentially took the position, not essentially, but explicitly took the position that because the data that was contained on the computer equipment and server that essentially had to be recreated, necessitating this enhanced audit by Deloitte and Tooch, essentially extended the period of restoration under the policy. It's our position that the court- It seems to me that the section of the policy related to extra expenses makes a distinction between property that would be covered by the extra expense provision and covered equipment, which is the cause to the damage of the property. You seem to be suggesting that the references to property in that section might be interpreted just as the same as covered equipment. That is correct, Your Honor. If you look at the- But why would the policy not say covered equipment if it meant covered equipment? Because the policy has several provisions in it, several different forms in it. Property could be anything. It could be any number of things depending on the context. If you look, Your Honor, at the provision- It says, Ann Arbor will cover the extra expenses that are necessary during the restoration period that would not have been incurred if there had been no direct physical loss or damage to property caused by or resulting from an electronic circuitry impairment to covered equipment. That's correct, Your Honor. That would suggest that there can be an impairment to covered equipment that damages property that is beyond the covered equipment. That would be true, Your Honor, if you read that provision in isolation. However, if you read the provision immediately before that talking about income coverages, because that's what we're talking about here, extra expense coverages is an income coverage premised on the following statement. If a limit is indicated on the schedule, we provide the coverages described below during the restoration period when your business is necessarily wholly or partially interrupted as a result of accident or electronic circuitry impairment to covered equipment. So the time element coverages there refer explicitly to covered equipment. Yes, it's true that the extra expense provision, which could arise in a number of contexts, doesn't make the explicit reference to covered equipment, but the introductory language dealing with income coverage- Are you saying that the only extra expenses that are covered are those related to equipment? In this context, yes, because the equipment here is under the equipment breakdown coverage grant. The covered property that's at issue is the computer equipment. The language would seem to be broader than what you're suggesting. We cover only the extra expenses that are necessary during the restoration period that you would not have incurred. It's expenses that are incurred. I don't see a limitation to- Well, in subparagraph- Directly as a result of relating to the property? In subparagraph 5 above that, Your Honor, where it talks about income coverages, the coverages described, when it talks about a limit on the schedule, it refers to the trigger point for and the ending point for the extra expense provision as damage to covered equipment, and covered equipment is a defined term. No, no, it's attributable to damage to the covered equipment, right? I mean, it's as a result of an electronic circuitry impairment to covered equipment. So the covered equipment sort of fries your circuit board, but if that impairs other property, that would be covered, wouldn't it? Not under this provision, Your Honor. Covered equipment, if you look at the definition of covered equipment, unless otherwise specified in the schedule- I think you're misreading 5A. It says we provide the coverage described below, which that includes extra expenses, during the restoration period when your business is necessarily or wholly or partially interrupted as a result of the impairment to covered equipment. This contemplates that covered equipment will be impaired. That will cause damage to property, and that property would be covered. Now, I think it's a fair question. What is the property that would be covered here? But the district courts seem to identify what that property was. It talked about, I think they've used the term the plaintiff's account operating system. That's the property that is covered by the extra expense subcategory. And why wouldn't that be a fair definition or be covered by the definition of property? Because the extra expense provision in the context of the equipment breakdown coverage grant is limited to the covered equipment, not just property generically. But it doesn't say that.  I mean, you may want it to say that, but it still doesn't say that. I mean, it would be easy to write such a contract. You just wouldn't say property. You'd say physical loss or damage to covered equipment resulting from an electronic circuitry impairment. And that would limit it to the covered equipment, period, hardware, et cetera. But this uses the term property, which is broader. And property is not expressly designed, but it seems to, from the damage provisions in the contract and the policy, would include buildings, and it would also include business personal property, which would include tangible and intangible assets. And so I guess I'm trying to figure out why it is that the plaintiff's account operating system, which is a combination of software, hardware, and data, isn't an asset that is coverable as property. Well, Your Honor, it's our position that the period of restoration definition does shed some light on that issue. The period of restoration, obviously, is the period of time during which the extra expense incurred loss must occur. Right. And that period of restoration says the time it should reasonably take to resume your business to a similar level of service, starting from the date of physical loss. What happens if there is no restoration? If there is no restoration of the property, then the insured under the policy is entitled to the actual cash value of the damaged property. In this case, it would be- And here, the district court concluded that there was no restoration, that the data had been lost forever, correct? Well, I think the district court concluded that the restoration period extended to the time during which the data that was lost was recovered and made usable again. But isn't that consistent- Some nine months after the computer equipment had been restored. But isn't that consistent with the definition of restoration period, which ends on the date that the property, not the covered equipment, but the property should be rebuilt, repaired, or replaced. And so if the property is the plaintiff's account operating system, which is a combination of hardware, software, and data, why wouldn't it be reasonable to say that that system was not repaired or restored until the audit was completed? When they basically recreated the data that now could be inputted into the functioning equipment, that puts the company back to where it was pre-impairment, pre-electronic circuitry impairment. Your Honor, because the income coverages in the equipment breakdown provision has that lead-in language that says that the time element coverages are tied to the repair of electronic circuitry equipment to covered equipment. And those are defined terms. Data is a separately defined term. You're talking about the restoration period definition? No, the definition in Section 5 entitled income coverages. Right. I mean, you're talking about 5A? Yes. Again, it seems to make a distinction between the impairment to covered equipment and the property that's damaged. And so it seems your argument turns on the property being the same as covered equipment. That's correct. But if that were the case, why would the policy say property and not just covered equipment? And then refer to covered equipment at the end of that section in 5D. I mean, this is your policy. So, I mean, generally speaking, you know, you're the ones, it's going to be interpreted against you, right? Under New York law? That's correct, Your Honor. But so am I right that your argument turns on us equating property in 5D with covered equipment as that term is used? That is correct. That is correct. And the underwriting intent there is so that when there is a damage to, when there is a loss of data such as occurred here, and, again, there's a separate coverage for data restoration, which was fully paid here, that the period of restoration does not remain open ad infinitum because the insured can somehow conceptually link some theoretical proximate cause to costs incurred long after the damaged equipment or properties. Following up to Judge Chin's question, my understanding was that data could never really be restored. And what happened was Deloitte had to develop workarounds in order to complete the audit that was essential to the ongoing business of Arizona Beverages. That is correct. And so I saw that as an expense, an extra expense that was incurred as a result of the equipment getting supercharged and destroying data. So we're not even really talking about data restoration. We're talking about a workaround, an extra expense that was reasonably incurred. The amount was not known at the time of the data loss. But the notion of restoration period has to be tied still to the continuing business operations of the company. And I don't think that you contest that the need for the annual audit was essential to the continued operations and to the business income of Arizona Beverages. Is that correct? We are not contesting that, Your Honor. You are correct that it was caused or necessitated. That cost was incurred as a consequence of the loss. The question, however, is whether in applying the restoration period provision of the policy, the end period is defined as the property should be rebuilt, repaired, or replaced, or businesses resumed at a new permanent location. And the reason for that or disjunctive end period is because the policy intends to indemnify the insured for one of two scenarios. One is they rebuild or replace the covered property, or two is the building burns down, they have to go to a different location, and they resume business at another property and as a consequence incur other costs. Here, that's not what occurred. The business was not resumed at a new permanent location. The fact is that the end period should be the property should be rebuilt, repaired, or replaced. Here, the property, according to our reading of the policy, was repaired or replaced on January 8, 2018. And the other costs that were incurred some nine months later or during that nine-month period, certainly after January 8, 2018, was not incurred during that period of restoration based on the way we read the policy, which is that the equipment breakdown coverage was triggered on the date of the loss. The extra expense was triggered on the date of the loss. And any expenses incurred, the period of restoration, therefore, would end when the property that should be rebuilt, repaired, or replaced was, in fact, rebuilt, repaired, and replaced. So if they had got an estimate from Deloitte that it was going to be a million dollars to do the workaround and had submitted that bill before the hardware was up and running, then it would have been covered. Is that right, as an extra expense? Well, no, I don't think that would be correct, Your Honor, unless that expense was incurred at that time. The work had been done. But here, that's not what happened. What happened here was the work was done, certainly after the equipment was restored. There was no request for a quote. There was no estimate that we have in the record that was submitted to the insured prior to the computer equipment itself being up and running on January 8, 2018. It was clear, though, that that work had to be done as a result of the damage to the covered equipment, right? I don't think the evidence demonstrates, the undisputed evidence demonstrates that. I think that became known after the computer equipment was restored and replaced. But it's our position that the extra expense provision, in the context of the Equipment Breakdown Coverage Grant, is limited to covered equipment, which is here, the computer equipment that was the subject of this claim and was paid in full by Hanover. All right, well, you've reserved three minutes for rebuttal. Thank you. But that's okay. We had questions. So we'll now hear from Mr. Lerner on behalf of Arizona Reverence. And maybe we should begin, Mr. Lerner, with whether or not we have jurisdiction before we spend more time on this. Yeah, well, so I took Judge Chinn's comment to heart. I believe we had filed a jurisdictional statement at the time the appeal was submitted. But we will be glad to go back and confirm that. My understanding We looked. I don't see a jurisdictional statement. But as long as no member is a citizen of New Hampshire or Massachusetts, I mean, I would guess that it's unlikely. Isn't Arizona basically owned by one guy? It is. There may be subsets of LLCs beneath this entity. But my understanding Just check and confirm to us that we have subject matter jurisdiction. Otherwise, all would have been for naught. Yeah, so can we ask you then to file a submission on that point about who the limited liability partner or members are? And if you can do that by Friday? Absolutely. Okay. We will get right on that. So thank you, Your Honors. And may it please the Court, Judge Chinn, Judge Sullivan, Judge Carney. My name is Jonathan Lerner, and I represent Arizona Beverages, the appellee in connection with this appeal. Arizona submits, Your Honors, that the decision of Judge Brown awarding its summary judgment, which was based on sound reasoning, concluding that the annual audit conducted by Deloitte was part of its business operations, and that the period of restoration of its property as a result of the October 29, 2017 electrical circuitry impairment loss ran through the date the audit was completed on October 24th of 2018. So it seems to me that this argument turns on property being different than covered equipment, right? I agree with you, Your Honor, and I thought your point was well taken. I don't think that there's any doubt that those are two different terms. Covered equipment is actually a defined term in the policy based on the quotes that are around it. Right, but I'm going to ask you what you think property means, because property is not a defined term under the policy. There are other sections that talk about property damage or damage to property that includes various things, including buildings and business personal property, which might be construed to include, I mean, a Black's Law Dictionary would call that to include tangible and intangible assets. But what is, I mean, it looks to me in reading your brief and your 56.1 statement, you folks were really talking about the restoration of data. Well, it's not just data, Your Honor. It's business information, but it's not actual restoration of data because obviously Deloitte cannot be involved in that. It would impair their impartiality. But the idea that property is limited to covered equipment based on this policy and the way it's written, I think, is really- Well, I might agree with you on that. I'm just trying to figure out what is the property then that was damaged. I believe the property would include the actual hardware, the software, the operating systems, the information systems, and the data and information that's stored on those computers as well. I think it's a combination of all of that. So what does it take to rebuild, repair, or replace that property? Which is this combination, it's a bundle of things is what it sounds like. So when or how does one rebuild, replace, or repair those? Well, in theory, it would be upon the restoration or recreation of all of that, whether it would just be the hardware and the software and the operating systems, but the data as well. And here there's evidence in the record that the data for 2016 and 2017 was never restored. So looking at the theoretical restoration period, which is what I believe the court did and what we referenced in our brief, I think that the end date for the audit really brings us back to where we would have been had there been no loss. I believe- Could you clarify? Sure, Judge. I didn't want to, please finish your answer. I think that there's no question that as a result of the loss that there needed to be this end around or this work around of the audit, that Deloitte at that point had to analyze different forms and types of data, that there was a need to have the data that was being analyzed checked and double-checked and in some instances triple-checked and confirmed by its home office. And it just took as long as it took to get to the point where they were able to then certify my financial information to comply with the obligations of my credit facility with the bank. And I think that that's what Judge Brown ruled in terms of the end date of the audit being the time that the property was properly repaired. Could you clarify for me, so are we talking about the data restoration? No. Deloitte didn't do that. Did someone else do the data restoration in order for Deloitte to conduct an audit or did they develop some independent workaround based upon other kinds of transaction records? Yes, the answer to your question is the latter, Judge Carney. So you're not really talking about data restoration because that was not possible, is that correct? No, not possible and also recognizing that it was limited by the sublimit of the policy, which the carrier did pay for that. But this is a completely different expense that was incurred to conduct the audit that was part of our usual business operations. And that if our system had not been destroyed on October 29th of 17, the day before the system would have been capable of providing whatever information or data was necessary for Deloitte to conduct their audit. And this is necessary to preserve business income. Yes. So that's why we're in this policy. But also there are two extra expense provisions, right, in the policy. One is the income coverage part and the other is the, I guess, electronic circuitry impairment. And are you relying on the extra expense provision in the electronic circuitry part? Or do you say they both would provide coverage for the increased cost that Deloitte charged you? Well, as Mr. Tennant, who was the adjuster for Hartford Steam Boiler, who admitted in his claim note that there was coverage for this, the extra expense coverage is embedded within the equipment breakdown coverage, which is where the coverage for the electronic circuitry impairment is found. So in the final additional commercial output program part, not in the, because there is a separate provision called extra expense in the income coverage part. But that's not what you're relying on. So it's within the context of the equipment breakdown coverage, but the definition for period of restoration is found elsewhere in the policy, and that's where we get back to that issue of the difference in the distinction between covered equipment and property. And as I believe Judge Sullivan had noted before, it's their burden. They're the ones that draft the policy. If they want to limit it to just the replacement of the actual hardware, which seems to me to be an absurd result, considering the extent of damage that this actual loss occurred to Arizona and its business, then they needed to state that in clear and unmistakable language. They have the power of the pen. They're the ones that need to be able to. And do you agree that there's no operative and controlling definition of property? There is not, not in the policy, but generally I would accept Judge Sullivan's definition, which would include both tangible and intangible assets of a company like Arizona, which would, of course, include not just the hardware and the software and the operating systems, but the data and the information that supports that as well. I'm still a little fuzzy as to what is the data that's necessary to run this operating system, this account operating system. How is that data any different to the data that was done and covered by the restoration of data provision of the policy? It has a cap. It's got a limit. So the data that was restored was basically putting back onto either a server or a hard drive or within the offices of Arizona things including sales, receivables, invoices, things of that nature. What Deloitte did, because that information was not available to it, is they worked around procedures using some other information that was available, that we did have within our offices in the form of sometimes paper files or other documentation, that they could then use to separately try to confirm the veracity and the accuracy of our financial information. Why isn't that data restoration? So you've got a whole bunch of analog paper copies and you've got a nice digital one. The digital one is fried. Why isn't going back to the paper and figuring out what the proper data is just a different old-fashioned version of data restoration? Because the way the policy defines data restoration, it actually requires the restoration of actual property that was lost. Here we're not recreating the property that was lost. Here we're working around that. Here we're doing an end-around workaround so that we can, on a transactional level basis, try to confirm the accuracy of information that may exist within our accounting system. Were you just coming up with the data in a different way? Or was Deloitte doing the audit without any data? How do you do an audit without data? No, they were using just different types and forms of data. They weren't using the data that would have been in existence. They were using different types and forms of data. Why isn't that simply restoring data? Because they didn't restore all the data. They just tested some of it so they could be in a position to be able to give the opinion that was necessary to complete the audit. Was there a different entity that developed the data set that they should work from? So Deloitte had come up with the workaround, and that was done in conjunction with Arizona to figure out the way that they could try to complete the audit, knowing that the information and the other data had been destroyed. You just said they didn't restore all the data. Does that suggest they restored some of the data? They did, but not as- Was that Berger, or was that- That was Berger, and that was not as necessary for what Deloitte was doing. Some of it may have been used by Deloitte as part of its audit, but the costs, the extra expenses incurred were because of the end-around, because of the need to incur all the additional time and hours in order for them to be able to analyze the information that was available to them to give the opinion on the audit required by the facility, the credit facility. They had to do more and other work. They had to do more and other work. More and other work, and then we had overtime from our employees. We had to engage lawyers to extend the deadlines that were part of the initial agreement, the May 31st deadline, to get that extended to the end of October. So, look, I can see why the expense incurred to extend deadlines would be covered. I'm not sure why sort of finding other ways to recreate or get access to the numbers you need to do an audit don't fall under data restoration. Because it's not, Your Honor, it's not part of data restoration. It's not recreating the data that was destroyed, and to this day that data- in an easy and accessible format to revenue numbers and expense numbers and, you know, by year, by month, right, all of that. And didn't this audit require you then to collect that information from other forms, paper, et cetera? But if those documents already existed, then that data was not destroyed. That data already existed in other forms. In other words, this wasn't a situation where people went and recreated the data, put it back on a server somewhere, and then Deloitte went and utilized that information to do its audit. This was a situation where they had to determine and develop different ways and different means of coming up with- Where does it say that in the 56.1 statements? Because that's what I didn't see. I mean, it seems to me that it's the very conclusory statements about what was done. And in fairness, that doesn't seem like Hanover really identified areas of dispute on this, because this wasn't their theory. But I'm still trying to figure out where what you just said to me is in the undisputed facts of this case. Yeah, I believe it's paragraph 21 of our Rule 56.1 statement. It's Joint Appendix 1391. It talks about how in November Deloitte reached out to plaintiffs to obtain planning documents, which include earnings before interest and taxes and sales numbers that were provided. Deloitte with a preliminary assessment to start to calculate what the materiality might be for a given year. This was how they started the process of obtaining the information. There's testimony in the record by Jennifer Costaldo, who is the actual auditor from Deloitte, as to how this event made them change everything that they did in connection with the audit. There's references in Judge Brown's decision specifically talking about some of the verification of some of the sales, as an example, that they had to do in order to verify the information so that they could complete the audit. It's not data restoration, Your Honor. Data restoration even Hanover has admitted in their depositions, Joseph Tamaris and Nicholas Tennant. This is what Judge Brown said. He said, Deloitte's enhanced audit procedures constituted a reasonable form of repairing, replacing, or rebuilding the lost data. To satisfy acceptable accounting principles. I mean, he keeps using the word data as though that's all it is. And that sounds like it's, why isn't that covered by the first part of the coverage section, which is the restoration of data, which has a cap? Again, only because Deloitte cannot be involved in data restoration. It's not something that they're allowed to do. It would impair or create a conflict for them in terms of their impartiality. So you're saying it was just a, not a particularly precise description of what was going on. Because Deloitte, there had to be a workaround developed that created data to be used, but that Deloitte couldn't be involved in. Deloitte's own time was analyzing and conceptualizing the kind of things that could be available to make it able to produce an opinion. Yes, Deloitte was only looking at information so that it could be in a position to give the opinion necessary to complete the audit. They were not creating data. They were not recreating data. They were using whatever information they determined was necessary for them to use based on what was not available so that they could reach those same conclusions and come to the opinions. And again, Your Honor, I would just acknowledge that Hanover has not disputed that the expenses of the Deloitte audit would fall under the data restoration supplement. I agree with that. I'm just looking at Judge Brown's opinions. Deloitte had to analyze additional types and forms of data to form its opinion. Yeah, I see where you're reading from, and I don't deny that that's what Judge Brown had included. But he also goes through in his decision on page 11 as an example that the audit procedures constituted a reasonable form of repairing or replacing or rebuilding the lost data to satisfy acceptable accounting principles. They had to analyze additional types and forms of data to form its opinion, including, and he gives an example, conducting a proof of cash from the transactions that went through plaintiff's bank accounts, which meant every transaction was identified, documented, and assigned a financial statement assertion. That just sounds like you're recreating the data that used to be on the server. But I think that's data that was available to them. I don't think that they were recreating that. That was not data that was destroyed as a result of- Well, I get that. Look, you had this great server. It was handy, and you could do really quick and fun stuff with it the way you get to do with a computer. And it got fried. Yeah. And now you have to go back and do it like your Ichabod, you know, Bartleby the Scrivener and go through the documents and figure it all out. But it seems to me, why is that not data restoration? It's old-fashioned. It's analog. It's time-consuming. It's really costly. But why wouldn't one call that data restoration? It's all the things he's just talked about, including doing proof of cash from transactions over various years and dates. Well, just to kind of jump on Judge Carney's point, the extra expenses were not related to that. The extra expenses were the additional time it took them to complete the audit, to certify, to verify, and to confirm the accuracy of the financials so that they could then give the opinion that was required by the credit facility. So I think that there's a distinction to be made between what Deloitte did and what Berger did in terms of actual recreation of data. So if there are no further questions, thank you, Your Honors, and we appreciate your time. All right. Thank you. Well, we'll now hear three minutes of rebuttal, give or take, from Mr. O'Leary. Thank you, Your Honor. Very briefly, first I want to emphasize the idea that in our papers we did raise the issue of the judge making reference to the restoration of data being one of the functions that Deloitte and Touche had undertaken, and that did not square with the testimony of the witnesses in this case that they were not in the business of restoring data. And Mr. Lerner does not dispute that. So we did take issue with that. He doesn't dispute that. He says they couldn't be the ones who were involved in restoring data. That's correct. In order to give a clean audit letter.  So they had to be involved in choosing the kind of data that could be generated, but someone else was doing that. And then their task was, as the court said, had to analyze additional types and forms of data to form its opinion, including, for example, conducting a proof of cash from the transactions that went through the bank accounts. These were alternative forms of providing testing that would ground its opinion letter, ultimately. Right? So they were not themselves restoring the data. That's correct. According to their testimony, that's true. You didn't dispute their 56.1 statement, that Deloitte was not part of a plaintiff's data recovery effort. No, we did not. Your Honor, I was just pointing out the fact that the judge misapprehended that particular aspect of their description of their own work as not restoring or replacing data. Well, I think, I mean, I read the judge to say Deloitte's enhanced audit procedures constituted a reasonable form of repairing, placing, rebuilding the lost data to satisfy gap. Right. So he was using that as a proxy. He wasn't saying that they generated data, I don't think. I think this was well in any event. Right, Your Honor. Just going back to the point Your Honor seized on earlier, I would just prefer the court, again, recognizing the issues that were raised in the colloquy with the court earlier this afternoon, that the extra expense provision, while it does not explicitly make reference to covered equipment, that the lead-in language to that provision in our reading of the policy, and I would submit that the underwriting intent here is clear and unambiguous. The lead-in language to what? Paragraph 5, income coverage. 5A. 5A. And if a limit is indicated on the schedule, we provide the coverages described below during the restoration period. The coverages described below would include the extra expenses coverage in 5D, right? That's correct. Okay. Okay, when, and here's the key language. During the restoration period. When your business is necessarily wholly or partially interrupted as a result of an accident or electronic circuitry impairment to covered equipment. Right. So the universe of property that is being addressed in that provision, dealing with the extra expense coverage, is damaged to covered equipment. It doesn't say that. It does, that's what the. It says it has to be related to an accident to covered equipment. But as Judge Sullivan's pointed out before, in the extra expenses, it says we covered the extra expenses that are necessary, that you would not have occurred, had there been no physical damage to property caused by or resulting from an accident to covered equipment. So there's a causation kind of requirement, but it doesn't say directly that it has to be the damage to the covered equipment. Well, what we would submit, Your Honor, is that the income coverage is, the framework for the coverage in general, is damage to electronic circuitry or covered equipment. And in this case, the covered equipment was the computer equipment. This is within a program called commercial output policy. That's correct. And the whole program is called income coverage. That means there's a property section, property coverage in part A, income coverage part, and then we're still really in commercial output, which I understood to be we're in business income. Right, but the commercial output coverage program was replaced in the definition of, the definition of covered equipment, as described in the commercial output program, was defined in the provision as covered equipment, unless otherwise specified in the schedule, means covered property that, not all covered property, but covered property that generates, transmits, or utilizes energy. So that is the universe of equipment that's covered under the extra expense grant of coverage in the equipment breakdown portion of the policy. Right, you need a triggering event of an impairment to covered equipment. Right. But it seems that the language implies, or more than implies, provides that if that impairment to covered equipment damages property that belongs to the insured, they're covered for it. Absolutely they are, during the defined period of restoration. And the defined period of restoration ends when the covered equipment that is damaged is replaced. And the property- Why do you keep saying that? Because the restoration period, your honor, on- It says property. Yes, it does, but- The definition of the restoration end period is not when the covered equipment is replaced or restored. It's when the property that was damaged as a result of the impairment is replaced, restored, or repaired. Understand, it doesn't say damaged to covered equipment there, but the property being referred- It easily could, right? I mean, it seems to me you're arguing for an interpretation that would have us equate property and covered equipment, but if that- In this context, not in all contexts, but in this context- Why not just say covered equipment when you mean covered equipment? Because the restoration period could be triggered by damage to other types of property in different contexts, such as if a building burns down real property or business personal property that falls within the definition of the policy. So there are other types of property that could theoretically trigger an extra expense loss here. But what we're dealing with here is property that comes within the purview of the equipment breakdown coverage. So the property by definition there is the property that's covered under the equipment breakdown coverage. And in the context of the extra expense provision, as I said in paragraph five, the income coverages are limited to covered equipment or electronic circuitry impairment. So the reason that provision in the restoration period is generic is because it can apply in a number of different contexts, which did not occur here. You could have a business income or an extra expense loss that results from damage to real property, from damage to business personal property. But once you plug in the equipment breakdown coverage, the time element coverage such as extra expense is limited to covered equipment or impairment of electronic circuitry. That's the whole point of having this additional coverage. Okay, why would 5A say when we provide the coverage, it's described below when your business is necessarily wholly or partly interrupted as a result of an accident or electronic circuitry impairment to covered equipment. Correct. As a result of, it doesn't say we're covering just the damage to your covered equipment. It seems to anticipate that there will be follow on interruptions and costs to your business when there is a damage to a piece of covered equipment. I would agree to that, Your Honor. Correct. The issue here is not the scope of the coverage. It's triggered by damage to covered equipment. And it ends when the property, in this case the covered equipment, is rebuilt, repaired, or replaced. And what the judge did in the underlying court in this case is he seized on section two, businesses resumed at a new permanent location and said that because the business, part of their business is keeping the banks happy and doing the appropriate independent accounting work that was caused or necessitated by this loss, was necessary to their business, that somehow extended the period of restoration. But Judge Brown is relying on the repair and replacing and rebuilding language of section one, isn't he? Your Honor, I don't have the opinion in front of me, but in his opinion, he made it clear that the requirement by the banks for them to do an independent audit and all of the work that was undertaken by Deloitte and Touche as a consequence of that was a part of their business and as a consequence of that, it extended the period of restoration because their business was not back to normal as a consequence of this loss. And what we argued was, well, it might have been caused or necessitated by the covered loss, but those expenses were incurred after the property that triggered the extra expense coverage under the equipment breakdown provision was restored fully. All of that occurred months after. So in closing, Your Honor, the only, I would implore that the court look at this decision as it is applied in the context of equipment breakdown coverage and not generally in the policy because that is not the situation we have here. This was a claim under the equipment breakdown and the property at issue, the real property at issue, was the computer equipment. Thank you, Your Honor. All right. Thank you, Mr. O'Leary. Thank you, Mr. Lerner. We will reserve decision. And Mr. Lerner, you will submit by Friday a letter explaining whether there is complete diversity with reference to all the members of the LLC and the citizenship of each, right? Yes, Your Honor. Great. Thank you. Thank you, Your Honor. Have a good day.